May it please the Court, my name is Stephanie Adractis and I represent the petitioner Joshua Gonzales. Gonzales was convicted of three counts of attempted murder, shooting from a vehicle, as well as personal arming enhancements based on evidence that was constitutionally insufficient to sustain those verdicts. No rational trier of fact could have concluded, beyond a reasonable doubt, that there was proof that Gonzales was one of the people who fired a gun at the victims. The verdicts were objectively unreasonable because no witness identified Gonzales as one of the shooters. When asked at trial if Gonzales was the man who shot them, two of them initially said no. Moreover- Counsel, let me just interrupt here because it went to a jury and the evidence of residue on his hand you said had little probative value. I assume that was argued before the jury and yet the jury found that it had probative value. Isn't that a question for the jury? Your Honor, yes, but one also has to look at the testimony of the expert witness who described the gunshot residue. He told the jury as well that there was no way to say that Gonzales had handled a gun or even been in the area of a gun based on those two particles found on his right hand. So that evidence simply was insufficient to conclude that he was a shooter and the expert witness for the government said so at trial. But you can't, okay, I think on any time, you have two things that I would say are difficult for you. First, it's under ADPA and second, insufficiency of the evidence. And so when you discuss insufficiency of the evidence, you can't just pick one witness. You have to pick, you have to discuss everything that was in evidence. And clearly, as a defense counsel, this was a decent case to argue as a defense counsel. But that being said, when you talk about the insufficiency of the evidence, I think what the jury heard was evidence that Gonzales and two other individuals were in a car in the area at the time of the shooting. Two, Gonzales was seated in the back seat of the car. He was in. Three, several witnesses saw one person shooting from the back seat of the car and one witness saw a second person shooting from over the hood. Four, two different caliber shell casings were found at the scene. Gonzales had been wearing a baseball cap featuring the Pirates P logo in support of the Playboys gang at the evening, in that evening beforehand. Six, a person in the back seat of the car in question was wearing a baseball cap. Seven, there was a dispute at the party that may have been gang related in which Gonzales was mingled. Eight, Gonzales exchanged words with men at the street before the shooting occurred. Nine, someone asked Anthony where he was from before shooting. And ten, Gonzales tested positive for gunshot residue during his interview with the detective. So that, all that is there. Okay, the jury heard all of that. So when we discuss insufficiency of the evidence, you can argue that's insufficient. And that's a reason someone could be found guilty, but they found it was sufficient. So how do you overcome that? Your Honor, because the theory upon which this jury returned its verdicts was one which even the prosecutor said didn't hold water, the jury returned verdicts that Gonzales personally and intentionally fired the gun that caused great bodily injury to all three of the shooting victims. And at excerpts of record 221 through 223, the prosecutor explicitly states, we don't have that. We don't have evidence that a gun, even if Mr. Gonzales fired the weapon and was the principal, we don't have evidence that it was his gun that shot the victims. Okay, but that doesn't mean, but they didn't just, they said we don't have, they didn't say we don't have evidence of that enhancement, did they? They did. It's in there. So they said, vote not guilty on that? He said specifically, and it's in the record. Why didn't he dismiss it then? He believed that the jury could have found that only a principal had to fire, and that Gonzales could be convicted based on an aiding and abetting theory. And so he told them explicitly, and I agree with the court, I don't think that instruction should have even been given. Given his concession, but they did give the instruction, and the jury inexplicably convicted him of personally and intentionally causing those injuries, which added 75 years to his sentence. He got 86 to life, 75 of that was based on a theory that the prosecutor himself said, quote, I can't point to any evidence of that. He literally said that, and if you look at those verdict forms, which I included in the excerpts of record, as well as the prosecutor's statement, it is a mystery how this jury could have concluded that there was evidence of that beyond a reasonable doubt. The prosecutor's actual theory on that enhancement was that a principal fired and caused the injuries, not that he could prove that Gonzales himself did that. And yet, they still convicted him. Well, if you have, but if you have gunshot residue that blows back on his, it was on his nightwear or whatever or something, I don't know, what was it on? There were two particles swabbed from his right hand 12 hours after the incident, which, as the expert explained, could just as easily have come from the law enforcement environment he was in when he was- Could have come from the handcuffs. It could have come from anything, the tabletop. I quoted a study in my brief. A huge majority of these particles are blown everywhere. And it come from a gun? Absolutely. But the problem with the GSR testing at all, and the FBI has made these statements, is that these particles go all over the place, and when you're in a police station, a police car, which he was, the likelihood of cross-contamination is enormous. They did a test with 40 people, and I believe it was something like 21 of them who previously had no residue, but they were put in a police car, came out and tested positive for residue, even though they hadn't handled a gun. Did the jury hear that? The jury did not hear that, but they heard Risto's testimony, where he carefully explained to them that just because these particles were there didn't mean that Gonzalez fired a gun. It could easily have come from contamination inadvertently. And they rejected that, I guess. I'm sorry, your Honor. They rejected that. The jury rejected that. They rejected that, but for reasons that are inexplicable, which meets the EDPA standard, when the prosecutor is telling the jury, we don't have that, I can't point to any evidence that this person's gun shot, fired, and hurt those people, it is inexplicable that a jury would nevertheless return a verdict of true on that exact enhancement. It is inexplicable. And that is the essence of an objectively unreasonable finding that the EDPA allows this court to grant relief. Is there a way to take... These were just two very tiny particles. And the people were surprised that they were there after 12 hours. That's correct. Very unusual that that would be the case. Now, can you take one of those little particles, both of them, and they have the shell casing. They had the shell casing on the Glock, that's the .40 caliber. And they had shell casing on another weapon that was a .32 caliber. And then there was testimony that someone was firing a .22 caliber pistol from the hood, right? Now, is it possible to take those little particles and test them against the residue in the shell casings? Your Honor, I don't believe that gunshot residue science allows an expert to say that particles came from a particular gun or shell. They're looking for the presence of certain elements in that ball. Well, there's residue in those shell casings. We know that, because I've read that in the record. And so the residue can have different chemical compositions. And so I'm just asking about that, whether anything like that was done. There was no testing that appears in the record trying to tie the residue from Mr. Gonzalez's hand to any of the weapons. And were there any weapons ever found? The only weapon that was found at the scene was a .38 caliber that was in the truck of the security guard. I know. He likewise tested positive. There were three weapons used in this firing, the .22, the .40, and the .32 caliber. No weapons were recovered by the police. And they also searched Mr. Gonzalez's home. And no weapons or any bullets or things like that were found at his house. Nothing in his house. Nothing at his house. They went there right away after he was arrested. The mother let him in. They went through the whole home, and they found nothing. There was nothing there. He's a 17-year-old boy. Yes, Your Honor. And he got, what, 86 years and eight months in prison. And as an indeterminate term, which means that it is a potential to life. And as I said, the 75 years is 25 enhancements based on directly and personally causing those great bodily injuries of which the prosecutor admitted at trial. There's really not evidence to support that. He only had a theory that someone in the car had caused the injuries and admitted he couldn't prove that it was Gonzalez. If those findings of personal responsibility for the injuries had not been entered or found true, his sentence would have been considerably shorter. And understanding the court's point that the jury is entitled to weigh the evidence and resolve conflicting inferences when you have the government's own representatives saying, we just don't have evidence of this particular element here, and I admit that, that's an objectively unreasonable verdict. What were the injuries to the other people? I'm sorry. There was three victims. Two testified at trial. Jose Arreola did not testify, but Omar Vargas testified. He had an abdominal injury, injuries to his legs. And Brian Padilla, I believe, was the other victim. And his injuries were not as severe and were not as described in as much detail. Is there anything in the record that tells us as to the two that were injured, the size of the missile that entered their bodies? Your Honor, the prosecutor's remarks that I'm quoting address that directly. It's at excerpts of record 221 to 223. He says, we do not have evidence that say that this hole came from a .40 caliber or this injury came from a .32. We don't have that. So we know that that evidence just wasn't there. They did not have evidence tying wounds or injuries or entries to a particular type of weapon. On the evidence, the defendant didn't testify at trial, correct? He did not. But they introduced a statement that he had given at the police department. Yes, the videotape, which I believe the courts received. Assuming a jury thought there was enough there, he was in the car, he was with his friends, are you suggesting that it's the sentence that is really amiss here? 86 years, eight months to life in prison. Are you arguing that perhaps it should be remanded for a resentencing? No, Your Honor. The reason I pointed out the sentencing consequences is because it's the verdicts that are unreasonable, which is what we're challenging as being supported by insufficient evidence. There was simply no evidence that Mr. Gonzalez fired the weapon that approximately caused those injuries to those people. And so the fact that he was found responsible, that there were true findings entered as to his personal arming, intentionally shooting and injuring those people, I am merely pointing out that the consequences to him of those findings with no evidence behind them was severe. You're not arguing instructional error either, right? No, Your Honor. I merely point to the instructions and to the verdicts to show the court that there was no evidence to support this element, and we have the government's admission that there was no evidence. Well, was there any witness who ID'd, identified the people who were in that black automobile? No, Your Honor. Two initially said that it was actually not Mr. Gonzalez and then equivocated and said, well, I really didn't see the face. But they gave a partial description. They said that they're Hispanic or Latino, and so we know they saw the face to some degree. Two said, not him initially, then equivocated and said, I didn't really see the face very well. The other said, didn't see them, can't identify him. There was the hat thing too, right? There was a mention of a hat. Again, that was equivocal. Witness saying, I don't know if it was forwards, I don't know if it was backwards. Asked a leading question, was it a baseball hat? Well, yeah, maybe. He couldn't say for sure, and no one said, yeah, that's the hat that Mr. Gonzalez was wearing. That's what it looked like. Nobody said that. There were a lot of people at this party, described as being about 100 people, all leaving at about the same time. The prosecutor's argument was, well, Mr. Gonzalez said he was in a car that was leaving at that time, so it must have been him, because the shots were fired from a car. But that only holds water if there was one car, and there wasn't. Michael Saniscoy, Brian Padilla both testified there were a lot of cars driving on the street at that time when the shots were fired. So it just doesn't identify him. It's not an identifying fact. Well, when he was being, when this young man was being interrogated by the detective, then someone came into the interrogation room and in a stage whisper told the detective that one of the people who had been shot had died. Yes, Your Honor. And he heard that, and he broke into tears. I watched the film, and his mother was on the phone. At the same time, his mother said, you've been a good boy. It works to that effect. You've never been a problem. And why did this have to happen? She was surprised that he got into trouble. And she talked about another son that she'd buried. She didn't want another son to have to bury him. And he said he was in a red Cadillac. And didn't he volunteer to take the detective and show him where the person lived who had the red Cadillac? Your Honor, I didn't see that statement in the transcript. I don't believe there was an investigation into the car that he was in. He did repeatedly deny that he'd fired the shots or that the shots even came from his car. And that, you know, my notes show that he gave the names of the other people in the red car and offered to show the detective where they lived. Your Honor, I'd have to review that transcript. I've reviewed it recently. Did you watch the tape? We don't have a copy of the tape. I discussed that with counsel earlier. Well, I have a copy of the tape. It's not hard to get. And you just can't read words in a transcript. You have to see what's happening and reactions of people. Oh, we have a we can, you know, the court has it. We can send you a copy of it or whatever, however you get it on your computers. Your Honor, I have a transcript of the videotape, which is what was lodged in the district court. It's a transcript. But what it shows as well is that Mr. Gonzales was pressured severely, not only by the false statement that somebody had died, but also repeatedly being told by the officer that they knew that he did it and that his only way to help himself was to tell them that he did or that someone else did. And so his statement, and this is a seventh. I read the, and listened to, and watched the video. I think the statement of, there were no waiver. He didn't waive his right to have an attorney. He didn't waive his right to remain silent. None of that was done. And you've got a 17-year-old kid over there. Yes, Your Honor. I mean, we'd ask the court to take those circumstances into consideration. And you know, it was argued in the brief. Certainly, he never gave a statement that could be reasonably construed as a confession. Never. He said to the police and to his mother that he didn't do it. And so that's what we can take from that tape. He denied it. He said that he did not file. He didn't want to identify certain people. He was afraid if he did that, that he would be killed. He violated that oath of silence. And if he gave that information, and he went to prison anyway, he'd be afraid to be killed in prison. I think, Your Honor. You can get anything you want in prison, CC. Guns, drugs, cell phones. So he was concerned about that. Yes, Your Honor. I think the most. And there were, with those bullets, there were seven hits. And but we don't know anything about the size of the bullets, the holes where they entered the human body. Nobody took any pictures. Right, Your Honor. Are there autopsy pictures? No, because nobody died, Your Honor. I'm sorry. That was a lie that was told, right? I'm even starting to believe what the detective said. Got a picture? Well, you don't have to. Just to clarify in my mind that if, since there were more than one bullet, more than one gun, that it doesn't have to be, he only has to personally fire a firearm in that assault. It doesn't have to be that his bullet has to hit those individuals. For the 12022.53D enhancement, which the true finding was found on and I submitted, the bullet he fires has to actually cause the injury. There were three alternatives. One of them, it was the one Your Honor just articulated, which is that he just intentionally fired at the victims. But there was a more specific enhancement which required the proof that his bullet actually caused those injuries, which is the one I'm referring to the prosecutor's statements about, that required specifically that his bullet cause the injuries. That's where three 25 year stacked consecutive sentences came from was those true findings as to those three victims on that. And there was simply no evidence of that and the prosecutor admitted that. Certainly the lesser enhancements which were charged were that the gun was fired. All right, I'll ask the government with their responses to your comments on that. Thank you, Your Honor. All right. Thank you. Good morning. Good morning, Your Honors. And may it please the court. I am Shinichi Sumitsu, Deputy Attorney General, on behalf of Respondent Apelli, the warden. Your Honors, my esteemed opposing counsel has done an excellent job of viewing the evidence in a light very unfavorable to the prosecution. But applying the Ed Postanda here, a fair-minded jurist could reasonably agree with the state courts that Petitioner was one of the shooters in the car based on, in part, five pieces of, five facts here. First of all, witnesses described a young Hispanic male shooting at them while wearing a baseball cap from the backseat of a black Cadillac. Second, Petitioner admitted to the police- They were, weren't they all Hispanic males that were at the party? Your Honor, the record doesn't suggest that they were all Hispanic males. Well. There's no doubt that the victims and the victim's friends seem to be of Hispanic origin. Yeah. And a lot more caps, too. Again, that is not in the record, but that may very well be the case. But that is not all, of course, Your Honor. In this case, the Petitioner admitted to the police that he was wearing a Pittsburgh baseball cap while sitting alone in the backseat of a Cadillac. Listen, I used to wear a Pittsburgh baseball cap, you know, because when they were in the World Series, you remember? They were selling them. I believe it was a while ago. They were selling them. Well, it's not a while when you're 92 years old, you know. So they were selling them at one of the sporting goods stores for 50 cents, say. So I bought one and had to pee, you know, because that's the initial of my first name. I remember my last name, sorry. And my wife goes to Pierce College, so I had that pee. And I even had people stop me up in Oregon, and they thought that I was in the Baseball Hall of Fame in the 1930s, and they were convinced of that, and I couldn't disabuse them. So I've still got, maybe I should have worn that today. Your Honor, I am 100% certain you would, however, have not been considered a suspect in this case, had you been at that party, because again... That gives me great comfort. So I am curious exactly what the evidence is on the sufficiency there, and also, too, if you can, after you, I think you were going to make five points or whatever, but after you do that, also respond to Appellant's counsel's argument that the prosecutor said there was no evidence of the personal use. Yes, Your Honor. The 25-year enhancements. So first, to continue with the five pieces of, the five pillars, I suppose, of evidence here. The third is that the witnesses in this case described being hit up or asked for their gang affiliation from the rear passenger of that Cadillac shortly before the shooting. And then fourth, Petitioner in this case admitted to the police that he was a member of the Playboys criminal street gang, and that he had been confronted by a rival L.A. gang shortly before the shootings took place. And then fifth, there was the gunshot residue, which this Court has already discussed. Well, let me ask again about the residue and the importance of that. He'd washed his hands, it was 12 hours later, the California Court of Appeals apparently found the gunshot residue evidence necessary to affirm Gonzalez's conviction on direct appeal. It stated, witness testimony and defendant's admission combined with defendant's positive gunshot residue test is sufficient to establish the corpus delicti of defendant's four crimes. And defendant's identity as a shooter, this has caused me some concern. Judge Nelson, that statement suggests that the Court found that to be one piece of evidence. And as this Court has already discussed, there are in fact multiple explanations for how gunshot residue... But all they talk about is like, you know, well, it was there, you know. And they don't talk about the fact that it was just two little particles. And even Rizzo, he was a lab guy, right? He was surprised too that anything could be there after 12 hours. He was surprised. He was surprised, you know. But if you read that opinion, well, you know, Court of Appeals do that all the time. When the Supreme Court takes one of my cases and it comes back to me, it's not the same case that I decided. You know, they rewrite the facts a lot of times. But when I read that, I couldn't believe it. Because there was nothing there but just two little particles. Your Honors, the jury could have concluded that those two particles came from a table from the police department. They could have also concluded that it came from a person who shot a .32 caliber weapon and had significant residue put on that person, such that even 12 hours later after washing their hands... But they could have, you could have taken those particles and matched them with the particle in that .32 caliber shell casing. Your Honor... Those particles are still in that shell casing. Your Honor, my experience with the sciences is largely limited to the social sciences. And I agree with opposing counsel that I am not aware of any technology suggesting that currently that gunshot residue can then be matched to specific shell casings. Well, they do it all the time. I'm sorry, Your Honor, I don't know that that is... Well, that's what I understood reading this. But again, applying the double decker of deference that is required in this case, I think the correct phrase is double dose, excuse me. Well, but okay, still in terms of the question that I have is in terms of they're not claiming instructional errors. So the jury was... So I'm taking that that the jury was properly instructed as to what the elements of the enhancement were. They were, Your Honor. And... But what I'm hearing appellant's counsel argue is saying that even though the prosecutor didn't dismiss those charges, that I have no evidence of that. So how... I completely and respectfully disagree with my opposing counsel's assessment of what the prosecutor said. What did the prosecutor say from your perspective? What the prosecutor said was that if the jury did not find that he was in a gang and that he didn't shoot, that in that situation, it would be problematic for them to find the multiple gun enhancements in this case true. But the statement, we don't know which bullet shot whom, and I'm paraphrasing here, of course, that was not the equivalent of saying we have no evidence that petitioner attempted to shoot these three individuals. There is no doubt that the jury in this case found that petitioner was a principal. He was a shooter. He shot at the three individuals. Well, I heard counsel say that his bullets had to hit. But if it's an attempted murder, you don't even have to hit someone to be guilty of attempted murder. That is correct. And... I mean, you have to try to hit them. That is correct. And in California, he can be guilty of attempted murder simply by being an aider and a better to those who had shot. But for the personal use enhancement, though, for the 25 to life enhancement, that is not an aider and a better. There were multiple firearm enhancements in this case. One of them does require that he be the principal and that he be the person who shot the gun during the commission of the attempted murder.  Where the bullet went into all three of the victims. That is absolutely not required in this particular case. Because it's attempted murder. It has to be attempted, yes. If it were murder, then it would have to be your bullet that killed the person, would it not? That would be correct. To find the principal firearm enhancement, yes. But if everyone's shooting at three people or whatever and they didn't get killed, you still can be guilty of attempted murder even if your bullet didn't hit the person, right? That's absolutely correct. I mean, you can be guilty of the firearm enhancement that he was found guilty of? That is correct. All right. And again, the statement we don't know is obviously not the standard of proof either at the trial or at this juncture. The jury found that he was the shooter who attempted to murder the three individuals in this particular case. So the only question before this court is whether the evidence at trial was so absent, if you will, that a judgment of acquittal was required. That is the AEDPA standard that we are applying here. We have no doubt, of course, as Your Honors had alluded to before, that this case could have gone differently. But the question is, could a reasonable juror have reached this conclusion and answer that question? Didn't the magistrate state that this was kind of a weak case? The magistrate judge made some sort of a statement acknowledging that the evidence in this case was not overwhelming, but on the other hand, still sufficient. It doesn't have to be overwhelming. It can be on the thin end, if you will, of the spectrum so long as it meets the level of sufficiency required in this particular case. Well, actually, he said the evidence against Gonzales is far from overwhelming. I mean, he was really quite specific about the sufficiency of the evidence. And this is what gives me pause about this case. Opposing counsel made a very good argument in terms of the three 25-year enhancements. You had to prove he was the one that shot. He was the principal shooter. Where is that proof? Your Honor, again, first of all, there are multiple enhancements here. Only one of them required that he be the principal that shot the weapons that were used to attempt murder in these three cases. That still doesn't answer the question. So going directly to your question, there is no doubt, and the prosecution said as much, that we do not know for certain who exactly fired which bullet and which injury was caused by which individual. We don't even know the other individuals, unfortunately, who were in the car in this particular occasion. But the jury could have easily concluded that Petitioner had intended to shoot and did shoot all three of the individuals if you look at all the evidence in the light most favorable to the judgment. Shortly before the shooting took place, he said to the police that he was confronted by this L.A. gang. They, you know, hit them up, whatnot. They had some sort of a verbal kerfuffle. And then afterwards, this shooting took place. It certainly suggests that he had the motive to enhance his own reputation within the gang as well as the gang's reputation. But he had an expert on that, too, right? He did, yes. I mean, there was an expert that testified when these sort of things happen, what it means in the gang, to the extent of it can mean that you've got to say something back to them, it can mean you've got to shoot them, but you've got to respond. Absolutely. The bravado... You can't let it go unanswered. Correct, Your Honor. The bravado and chutzpah that the L.A. gang members showed in this particular... But let's keep chutzpah out of this. Okay. The bravado then, I suppose, of the L.A. gang members who said that... who confronted him ultimately made him in the position of having to show his gang's dominance. And so the shooting in this case, it is easy to conclude that the multiple shooters were working in concert, because as the gang expert testified, gang members usually hang out together and they're going to do these types of shootings together to convey a message here. Let me ask you, did the expert, Risto, did he state, testify that Gonzalez fired the gun that shot the victims? He did not. He did not. No. And again, there is no... That's all right. You've answered the question. Okay. And so we don't even know as far as the entry point in the bodies of the people who were wounded. We don't know the size of that point of entry, which could tell you what the caliber is. Your Honors, my best recollection is that there was at least one 32 or 40 caliber weapon that was found lodged in one of the victims' bodies. I apologize that I can't be more precise than that at the moment. Well, if the jury believed that he was in fact in the car, then the jury could also believe that he knows who else was in the car. And if other people were the shooters as well, that he would know that, right? Absolutely, Your Honor. There is every reason for the jury to not have taken the petitioner's denial seriously. He said to the officer, I can't tell you the truth. He said, I can't snitch on no one, repeatedly suggesting at the very least that he knew the individuals who engaged in the shooting if it was not him. That's the code of silence, sir. Right? Yes, yes. And it's not limited to gang members, is it? No, but I think that the gang expert properly testified that it is certainly much stronger amongst gang members. How do we know that? I think as the expert testified, the retaliation for snitching amongst gang members. You can get experts to testify to anything you want them to testify, you know? Well, Your Honor, in this bid... But that, I think that, but you can. But the jury is instructed, you can believe or disbelieve what the experts say. So that's part of the body of evidence that they have to consider in deciding... That is absolutely correct. ...reaching their verdict. And one final thing. Judge Fragerson, you had asked opposing counsel with regard to what he said as to helping the police to identify the source of that so-called red Cadillac. My recollection of the record is certainly that at no point did he offer any names of the individuals who were in there. When he said that he was in a red Cadillac, at no point did he attempt to help the police, to help them locate this so-called, you know, bullet-ridden red Cadillac that would help corroborate his story. That was not in the record. What, he said a Cadillac was bullet-ridden? At some point, and again, going to his inconsistencies. Initially, he said he was not there at the shooting, that nobody tried to shoot at him. Later, when the officer... Was not there at the shooting because he had driven off. That is what he said. First. Absolutely, yes. And later on in that same interview, though, when the officers asked him, were you shot at? He said, probably. When asked whether the vehicle had holes, he said, probably. But when viewing the evidence and the like, most favorable to the judgment here, it seems pretty clear that any holes to be found were in Petitioner's story, not in any so-called red Cadillac. I'm sorry, I interrupted, Your Honor. That's all right. It's okay. Happens all the time. Unless Your Honors have any further questions, we submit on the briefs, and thank you for that. Well, what about the handcuffs? They could have been a source of little particles. They could have, Your Honor. There was absolutely nothing in the record suggesting that an officer had ever touched his handcuffs, or that they had been transmitted in that way. That would be your speculation. They put handcuffs, go on a lot of... Do they take the handcuffs after they uncuff the person who's arrested and wash them off? I assume... Just put them on the next person, next person. Your Honor, I assume they do, but the jury was free to conclude that that was not how the gunshot residue was transmitted in this case. There is no doubt that the source of the residue could have come from multiple sources, and we do not suggest that we know for certainty that the residue here stems from a gun. However, in light of all the other evidence... And no witness identified the people in that black automobile. Witnesses did describe... No, they didn't say that is so-and-so. That is so-and-so. They saw a hat. They saw a hat? They saw a hat. And they saw what they thought were Hispanic males because they had, you know... Yes, and they also observed that the person in the back seat seemed to be the same age as the other partygoers, and I assume that to mean teenagers and 20-somethings. Well, we know that the eyewitness identification is inherently unreliable. We know that, don't we? Absolutely, Your Honor, and if that were the only evidence in this case, I could agree. And we know that two little particles... That's amazing on someone's hand. Absolutely, Your Honor. Twelve hours later... But there's no dispute in this case. You can get all these little things together, and then it's all... There it is. And we know that the officers lied when they told this boy that one of the victims had died, and now it was getting... It was now we were in a murder case. They did that, didn't they? And they didn't take any waiver of their constitutional rights. They did properly Mirandize. Well, it was kind of F-A-S-S-E-D, you know, but no waiver. Do you give up your right to have an attorney? Nobody asked them that. You know, if you tell us you want an attorney, we'll stop now and get you an attorney. It's a 17-year-old kid. Your Honor, the petitioner in this case... And when he found out that someone had died, he started to cry, didn't he? Your Honor, actually, our office was responsible for providing the video to the court. Neither my opposing counsel nor I have seen it, however. We had it sent directly from the San Bernardino County DA's office. And as you might imagine, they've been a little busy during the last couple of days, and they haven't been able to send either of us a copy as well. Well, we asked for it long ago, you know, and just got it. If that is the case, I apologize, Your Honor. Our office, I believe, received an email on Wednesday. We're forgiving. But, Your Honor, again, the evidence in that video, I think the key thing is not so much his demeanor, which, of course, the jury was allowed to assess, but his own admission that he was in the backseat of a Cadillac wearing a baseball cap. He was alone in the backseat. A red Cadillac. He said, yes, that it was a red Cadillac. Red Caddy. Correct. Whereas the witnesses said that it was a black Cadillac. But, again, when viewing the evidence in the light most favorable to the judgment, there is no doubt that a reasonable juror could conclude that he was the shooter. Unless Your Honors have any further questions, we submit. Thank you for your time. Thank you. Yeah, yeah. I mean, we gave him, he got 86 years, so go ahead. Thank you, Your Honor. Going to the prosecutor's statements about the 12022.53, the enhancement, which is the specific enhancement I'm referring to that added three terms of 25 years. He said, at excerpts of Record 221, did he discharge causing the great bodily injury to each individual? Well, I can't point to any evidence that says the gun in this defendant's hand is the one that caused the bullet injuries on those victims. I can't do that. That's not there. Bullet through and through the hole in this guy's leg, that's a 32 or a 40. We don't have that. But what we do have is, he says the 1402, and he argues an alternative theory that the jury could find that a principal had done. If you don't even have to hit someone on an attempted murder, you just, you don't. So it, I, it, you don't need to be able to show that his bullet hit them to, for him. That, that doesn't make him factually innocent if it wasn't his bullet. Of the specific allegation, it does. Your Honor is correct. Of the attempted murder, no. No, but even, but that's what he was convicted of, attempted murder. Along with these allegations, which added an enormous amount to his sentence. And the reason I pointed this to this in my brief and why I'm returning to it now is because the case law says that when there's a sufficiency of the evidence challenge that the court must review the verdict actually returned by the jury, not alternate possible theories. Here, the jury returned a verdict that was objectively unreasonable because the prosecutor- Read me the enhancement. I'm sorry? Read me the enhancement. The, the enhancement is in the excerpts of record. I don't have it in my, in front of me right now, but I know the elements which it requires that he intentionally shoot at the victim and that he cause the great bodily injury of the victim. Those are the elements. And the jury was given specific verdict forms, which are in your excerpts of record, where they found true that he, my client had done that, caused the injuries after intentionally firing the gun. The prosecutor admitted in these pages of transcript I just read, they had no evidence of that. He was actually trying to argue an alternate theory that a principal, an unspecified person had caused those injuries, had directly caused the injuries. But that wasn't the verdict the jury returned. Inexplicably, they found there was sufficient evidence to identify Mr. Gonzalez as the specific shooter who caused the injuries when in fact, there was absolutely no evidence of that even under the government's theory of the case. So as I argued in the brief, Mitchell versus Prunty, one of these, one of the court's precedents addresses the idea that the court should not affirm a conviction based on a theory that has no factual support. If that's the theory that the jury used to convict him. And here, one could speculate about all kinds of possibilities because there just wasn't evidence about what actually happened. But this jury made a objectively unreasonable factual finding based on evidence that simply was not there. And I would urge the court to look at the excerpts, the statute, the government's argument, because we can see from that, that this is an AEDPA unreasonable finding. You covered this in your brief? And the excerpts contain the verdict forms for the enhancements, which show you what the elements are, the citations to the statute. It contains the government and the defense closing argument where you can see where this was discussed and that it was absolutely a verdict that was not supported by the evidence presented. Okay, thanks. Well argued on both sides. Thank you.
judges: Pregerson, D.W. Nelson, Callahan